UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

**Runyan Enterprises LLC,**

Plaintiff,

v.

**Jon Wilson;**
**James Gill;**
**Larry Dakota Myers;**
**Chasity Goodson;**
**Gage Clark;**
**Destany Parrish;**
**Sam Boswell;**
**Tony Krebs;**
**David Scull;**
**Entertainment Restoration LLC;**
**Tree City Games LLC;**
**Maritime Gaming LLC d/b/a Gametopia;**
**and John Does 1-10;**

Defendants.

**Case No:** 3:26CV-418-RGJ

**COMPLAINT**

Plaintiff Runyan Enterprises LLC states as follows for its Complaint against Defendants Jon Wilson ("Wilson"), James Gill ("Gill"), Larry Dakota Myers ("Myers"), Chasity Goodson ("Goodson"), Gage Clark ("Clark"), Destany Parrish ("Parrish"), Sam Boswell ("Boswell"), Tony Krebs ("Krebs"), David Scull ("Scull"), Entertainment Restoration LLC ("ER"), Tree City Games LLC ("Tree City"), Maritime Gaming LLC d/b/a Gametopia ("Gametopia"), and John Does 1-10 (collectively, the "Defendants"):

**NATURE OF THE ACTION**

1. This action arises from a multi-year fraudulent scheme orchestrated and executed by trusted high-level employees of Runyan Enterprises LLC. From 2021 through 2024,

Defendants engaged in widespread theft, embezzlement, procurement fraud, employee conspiracy, conversion of property, creation of shell companies, diversion of inventory, unauthorized ACH transfers, computer hacking, and misappropriation of corporate assets resulting in over $2 million in losses.

**THE PARTIES**

2. Runyan Enterprises is a Connecticut limited liability company. Its present members are Christopher R. Runyan and Leila Runyan. Christopher R. Runyan is an individual residing in, and a citizen of, Arkansas. Leila Runyan is an individual residing in, and a citizen of, Arkansas. Thus, for purposes of federal diversity jurisdiction, Runyan Enterprises LLC is a citizen of Arkansas.

3. Wilson is an individual residing in, and a citizen of, Kentucky.

4. Gill is an individual residing in, and a citizen of, Kentucky.

5. Myers is an individual residing in, and a citizen of, Tennessee.

6. Goodson is an individual residing in, and a citizen of, Kentucky.

7. Clark is an individual residing in, and a citizen of, Kentucky.

8. Parrish is an individual residing in, and a citizen of, Tennessee.

9. Boswell is an individual residing in, and a citizen of, Kentucky.

10. Krebs is an individual residing in, and a citizen of, Kentucky.

11. Scull is an individual residing in, and a citizen of, Kentucky.

12. ER is a Nevada limited liability company. Its present members are James Gill and David Scull. David Scull is an individual residing in, and a citizen of, Indiana. Therefore, ER is a citizen of Kentucky and Indiana for diversity purposes.

13. Tree City is a Tennessee limited liability company. Gill is its sole member. Therefore, it is a citizen of Kentucky for diversity purposes.

14. Maritime Gaming LLC d/b/a Gametopia is a Kentucky limited liability company. Gill is its sole member. Therefore, it is a citizen of Kentucky for diversity purposes.

15. Plaintiff is ignorant of the true names and capacities of defendants sued herein as JOHN DOES 1 through 10, inclusive, and therefore sues said defendants by such fictitious names. Plaintiff will amend this complaint to allege said defendants' true names and capacities when the same have been ascertained. Plaintiff is informed and believes and, based thereon, alleges that each defendant designated herein as a DOE is responsible in some manner for the transactions, events and occurrences hereinafter alleged. Whenever appearing in this complaint, each and every reference to defendants, or to any of them, is intended to be and shall be a reference to all the defendants hereto and each of them, named and unnamed, including all fictitiously-named defendants, unless said reference is otherwise specifically qualified that the allegation specifically refers only to a particular defendant.

## JURISDICTION AND VENUE

16. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that there is complete diversity of citizenship of the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs.

17. This Court has personal jurisdiction over Defendants because Defendants are authorized to do business and are conducting business throughout the Commonwealth of Kentucky; they have sufficient minimum contacts with Kentucky; and/or sufficiently avail themselves of the markets of the various states of the United States, including Kentucky, to render the exercise of jurisdiction by this Court.

18. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to this claim occurred in this District and Defendants are subject to personal jurisdiction in this District. Venue is also proper because Defendants are authorized to conduct business in this District and have intentionally availed themselves of the laws and markets within this District and do substantial business in this District.

## FACTUAL ALLEGATIONS

19. For a period spanning no less than three years, from approximately 2021 through April 2025, Defendants operated a coordinated, multi-faceted fraudulent enterprise designed to systematically siphon assets, inventory, operational capacity, intellectual property, and financial value from Plaintiff.

20. This enterprise was directed primarily by Wilson, Plaintiff's former Vice President of Operations, who possessed unrestricted administrative authority over nearly every critical system within Plaintiff's business.

21. Wilson's authority included full control of purchasing, inventory distribution, ACH and vendor payments, payroll, personnel management, field management supervision, ordering channels, and administrative access to Plaintiff's Google Workspace environment, including email forwarding, deletion, and user-level visibility.

22. Armed with this authority, Wilson implemented a structure of interrelated schemes utilizing:

a. unauthorized vendor accounts;

b. fabricated invoices;

c. diverted supplier shipments;

d. secret leased offices;

e. misuse of payroll labor;

f. resale of Plaintiff's assets through independent entities; and

g. coordinated concealment through falsified reporting.

23. The objective of the enterprise was to use Plaintiff's resources to start and run competing businesses, including, but not limited to, ER, Tree City, and Gametopia, while enriching Defendants and leaving Plaintiff with the corresponding losses.

24. Wilson's role as VP of Operations placed him in a fiduciary position of the highest trust and responsibility.

25. Over the course of his tenure, Wilson gained unmitigated control over:

a. purchasing authority;

b. vendor setup and approvals;

c. store inventory distribution;

d. repair operations;

e. return processing;

f. administrative email access;

g. bank account controls and ACH permissions.

26. Wilson used this authority to conceal inventory movements, erase digital footprints, direct shipments to undisclosed locations, hire employees, and bypass accounting oversight, all without the knowledge or approval of Plaintiff.

***Gametopia***

1. In or around late 2021, Plaintiff agreed to allow Wilson to establish a pilot repair department within Plaintiff's retail locations for the purpose of repairing defective merchandise.

2. In or around late 2021, Wilson, Gill, and Krebs formed Gametopia, which they used as a shell to invoice Plaintiff for goods already owned by Plaintiff, at substantially inflated prices.

3. Thereafter, Wilson, Gill, and Krebs began shipping products to Plaintiff and issuing invoices under Gametopia.

4. In or around January 2022, Plaintiff leased commercial space in Shepherdsville, Kentucky, for the purpose of housing offices for Wilson, Gill, human resources personnel, and storage.

5. In or around early 2022, without Plaintiff's authorization, Wilson and Gill gradually expanded Plaintiff's repair operations into the Shepherdsville location, where they also began operating Gametopia.

6. Wilson bypassed accounting controls by establishing ACH payments directly from Plaintiff's bank accounts to these entities.

7. Some payments were processed through Wilson's personal PayPal account linked to Plaintiff's corporate credit card.

8. Over a period of approximately two and one-half years, Wilson purchased 25,878 purportedly refurbished controllers from Gametopia on behalf of Plaintiff, charging Plaintiff a total of approximately $478,652. These controllers were never entered into Plaintiff's inventory records.

9. During the same period, Wilson purchased an additional 879 refurbished controllers, totaling $50,600, from primary vendor, Video Game Advantage, and distributed them to Plaintiff's stores and the Shepherdsville location in an effort to create the appearance of legitimate procurement activity.

10. At all relevant times, Plaintiff's own repair department was refurbishing existing controllers, rendering purchases of additional controllers from Gametopia, Video Game Advantage, or other vendors unnecessary.

11. In addition to controllers, Wilson used Plaintiff's funds to purchase merchandise from legitimate vendors and then caused those same items to be resold to Plaintiff through Gametopia at substantial markups. Such purchases were made using Plaintiff-funded payment methods, including a corporate credit card linked to Wilson's personal PayPal account. Examples include, but are not limited to:

a. Approximately $90,000 in wholesale enamel pins purchased at approximately $1.00 per unit and resold to Plaintiff through Gametopia for an average of $2.50 per unit, totaling $190,826 for 76,942 units;

b. 1,560 enamel pin sets resold to Plaintiff through Gametopia at markups ranging from 100% to 200%, totaling $27,720;

c. 5,724 reproduction games resold to Plaintiff through Gametopia at an approximate 150% markup, totaling $69,487;

d. 33,815 "Funko Pop Protectors" resold to Plaintiff through Gametopia at markups ranging from 200% to 300%, totaling $74,410;

e. 4,900 HDMI cables available at approximately $0.50 per unit, resold to Plaintiff through Gametopia at $2.70 per unit, totaling $13,250; and

f. 31,778 repair part units at a total cost of $33,469.

12. Plaintiff made numerous payments to Gametopia via ACH transfers, which incurred no processing fees, while Defendants charged Plaintiff a 3% credit card processing fee totaling $18,371.

13. Plaintiff was further charged $10,952 in shipping-related fees associated with these transactions.

14. Through the foregoing conduct, Wilson caused Plaintiff to repurchase its own inventory at markups ranging from 100% to 300%, while also imposing improper and inflated transaction fees.

15. In total, Plaintiff paid $917,136 to Gametopia in inflated or fraudulent transactions, exclusive of the original costs of the underlying inventory, which had already been borne by Plaintiff.

***Entertainment Restoration***

16. In or around 2022, Wilson, together with certain co-conspirators, formed Entertainment Restoration, a business engaged in repair and refurbishment activities.

17. Wilson caused ER to operate as a competing resale and refurbishment enterprise, utilizing Plaintiff's equipment, employees, and leased office space without Plaintiff's knowledge or authorization.

18. Wilson directed substantial company funds to the repair department, procuring tools, supplies, equipment, and parts in volumes far exceeding operational needs, without providing Plaintiff with any explanation.

19. Defendants used this initiative as a pretext to covertly develop infrastructure, staffing, tools, sales channels, and inventory supply chains for ER.

20. Wilson intentionally maintained opaque and inconsistent records, presenting falsified purchasing logs, inflated or fraudulent invoices, and misleading summaries to Plaintiff to disguise the magnitude of diverted resources.

21. Expense summaries reflect repair-related expenditures for Plaintiff's repair department totaling approximately $1.6 million, including: (a) $767,219 in product purchases from Gametopia and other vendors; (b) approximately $300,000 in labor costs; (c) $849,997 in rent, utilities, taxes, and related overhead expenses; and (d) approximately $332,781 in supplies, tools, and furniture. Upon information and belief, the majority of these expenditures were incurred without Plaintiff's knowledge or authorization and were not utilized for Plaintiff's repair operations, but instead were diverted to ER.

22. During the same period, gross sales totaled only $439,000, resulting in an operational loss of approximately $1,011,000.

23. These figures demonstrate extensive diversion of incoming and outgoing units and reveal that a vast majority of repaired or returned consoles never re-entered Plaintiff's legitimate inventory.

24. Without Plaintiff's knowledge or consent, Wilson caused at least two additional office spaces to be leased in Plaintiff's name at the Shepherdsville location to expand the repair department. Wilson further caused Plaintiff to hire approximately four to five additional repair technicians, placed on Plaintiff's payroll, who primarily performed work for ER rather than Plaintiff.

25. Multiple business records of ER reflect that Plaintiff's Shepherdsville offices were used and listed as the company's mailing address.

26. On multiple occasions during the relevant period, Plaintiff expressly instructed Wilson to scale down repair operations and instead focus on core retail store operations.

27. Wilson did the opposite, expanding the operation and acquiring additional equipment, parts, and storage capacity without Plaintiff's knowledge.

28. When confronted, Wilson falsely stated he would "close the offices" and "liquidate all assets."

29. Instead, Wilson covertly "sold" the facilities, equipment, tools, and inventory to ER, which continued operating inside Plaintiff's own leased premises and still currently operate out of Plaintiff's leased premises.

30. Wilson did not involve Plaintiff in the timing or negotiation of the purported "sale" of assets.

31. Several weeks thereafter, Wilson reported that all liquidated assets, including fixtures, tools, supplies, computers, and furniture, had been sold to ER for approximately $7,500, an amount far below fair market value.

32. An internal review subsequently identified approximately 43,000 missing units of inventory owned by Plaintiff that should have been included and accounted for as part of the purported sale. These missing units consisted of:

a. Customer returns and defective inbound merchandise located at Plaintiff's leased premises; and

b. Refurbished consoles and controllers, including those purchased from Gametopia and other vendors.

33. Upon information and belief, the total retail value of these missing units exceeded $3.1 million.

34. By orchestrating and executing the grossly undervalued sale of Plaintiff's assets to ER for approximately $7,500, Wilson breached his fiduciary duties to Plaintiff, independent of and in addition to his self-dealing and other misconduct.

35. Repair technicians were directed to perform work for ER while on Plaintiff's payroll.

36. Wilson used Plaintiff's labor force, funds, equipment, resources, and other supplies to perform repair work, refurbishments, inventory processing, and order fulfillment for ER.

37. Payroll records reveal unauthorized raises, bonuses and payments, including a $4,000 bonus improperly paid to a repair manager around the time ER was formally registered.

***Tree City Games***

38. In the months preceding their departure, Wilson, along with Gill and Myers, communicated to Plaintiff's employees their intent to establish a separate card-selling business.

39. While serving as employees of Plaintiff, Wilson, Gill, and Myers founded Tree City, an online trading card reseller.

40. The Tree City storefront launched in May 2024 while all three principal individuals remained employed by Plaintiff.

41. Witnesses observed Myers physically removing several thousands of trading cards from Plaintiff's stores, including locations in McMinnville, Tennessee and Shepherdsville, Kentucky.

42. When questioned by employees, Myers lied and claimed Plaintiff's owner instructed stores to stop selling trading cards.

43. Purchases of trading cards from vendors show dramatic and unexplained spikes at specific store addresses, including:

a. multiple $10,000+ card shipments to Shepherdsville;

b. inflated orders routed only to Wilson-controlled locations;

c. dozens of high-value orders shipped within short intervals;

d. card shipments totaling tens of thousands of units missing from all receiving logs.

44. Reviews for the subject seller account on TCGPlayer.com began appearing in or about May 2024. By November 2024, when Plaintiff discovered the account, it reflected 4,615 confirmed sales, 4,543 ratings, and over 5,000 active product listings, consisting of inventory owned by Plaintiff.

45. At the same time, Tree City's website displayed more than 200,000 product listings comprised of inventory owned by Plaintiff. Representative listings reflected individual cards offered for sale at prices ranging from approximately $40 to $1,500.

46. Photographs posted on Tree City's Facebook page in August 2024 show trading cards arranged on tables at Plaintiff's McMinnville store while bearing Plaintiff's price labels, demonstrating intent to sell stolen inventory.

47. Financial analyses of Plaintiff's business records indicates that at least $300,000 in new trading card game inventory was missing from Plaintiff's stores.

48. Additional analysis reveals a large discrepancy between Wilson's "reported spend" and actual spend for trading card procurement.

49. Unit counts, sales data, and procurement summaries demonstrate abnormally high trading card acquisition costs inconsistent with Plaintiff's historical operations, with a substantial portion of such inventory shipped to the Shepherdsville and McMinnville locations but never recorded in Plaintiff's point-of-sale or inventory management systems.

50. Defendants, through Tree City, utilized Plaintiff's own email address, support@gxc-stores.com, as a point of contact, further evidencing operational overlap and creating confusion between Plaintiff's legitimate business and Defendants' competing enterprise.

51. These patterns indicate systematic diversion of card shipments for resale through Tree City.

***Wilson's Continued Theft***

52. Wilson, while serving as VP of Operations, used Google Workspace administrator tools to secretly access Plaintiff's emails and established forwarding rules that copied Plaintiff's incoming and outgoing messages to himself.

53. Wilson deleted or altered files, reports, and correspondence to hide evidence of theft and vendor irregularities.

54. Wilson continued directing shipments to Plaintiff's regional office for ER operations.

55. ER employees, including Gill, Clark, Scull, and repair technicians, continued working from Plaintiff's leased facilities even after Wilson claimed to have "shut down" the repair department.

56. Plaintiff did not authorize ER's use of any office, equipment, inventory, or personnel.

57. Plaintiff discovered Defendants' illicit activities in late May 2024, after which it undertook an investigation into the scope of such activities.

58. Following Wilson's termination in April 2025, Plaintiff requested the return of all company property in his possession. Wilson represented that all computers, including his assigned work computer, had been sold or otherwise redistributed, and further claimed that his work computer had suffered a critical hard drive failure and was discarded. Wilson failed to provide any documentation or evidence substantiating the alleged sale, redistribution, or disposal. To the contrary, Plaintiff possesses evidence demonstrating that Wilson's work computer remained active for months after his termination.

## CAUSES OF ACTION

### *Count I: Breach of Fiduciary Duty (Wilson)*

59. Except to the extent inconsistent with the relief sought in this Count, Plaintiff incorporates the allegations as set forth above by reference.

60. Wilson, as Vice President of Operations, owed Plaintiff a fiduciary duty of loyalty, honesty, care, good faith, fair dealing, and full disclosure.

61. Wilson held extensive administrative control over Plaintiff's financial operations, inventory systems, payroll, banking access, purchasing authority, vendor relations, email systems, and store operations.

62. Wilson knowingly breached his fiduciary duties by, among other actions:

a. diverting inventory, funds, and assets for personal gain;

b. establishing undisclosed competing businesses;

c. directing employees to perform work for his companies while on Plaintiff's payroll;

d. concealing material information from Plaintiff;

e. creating false records, reports, and invoices;

f. misusing administrative email access; and

g. manipulating ACH payments, purchasing systems, and vendor accounts.

63. As a direct and proximate result of Wilson's breaches, Plaintiff suffered millions of dollars in damages, including lost inventory, inflated vendor costs, misappropriated labor, and diversion of business opportunities.

***Count II: Fraud***
***(All Defendants)***

64. Except to the extent inconsistent with the relief sought in this Count, Plaintiff incorporates the allegations as set forth above by reference.

65. Defendants knowingly made false representations of material fact to Plaintiff, including but not limited to:

a. falsified financial summaries;

b. fabricated vendor invoices;

c. misrepresented inventory needs;

d. concealed operation of competing businesses;

e. provided false explanations for missing goods;

f. falsified supplier addresses and shipping destinations.

66. Specifically, as detailed above, Defendants made the following misrepresentations:

a. Wilson falsely represented to Plaintiff that the repair department existed solely to service Plaintiff's customer returns and store inventory, while secretly using it as

a launch platform for his privately owned company, ER, with the assistance of Scull.

b. Wilson, Gill, and Clark caused repaired and customer-returned consoles and accessories to be transferred directly to ER rather than returned to Plaintiff's stores, while falsifying or omitting tracking records.

c. Goodson knowingly assisted Wilson in hiding unauthorized purchases, vendor activity, and inventory discrepancies.

d. Wilson falsely told Plaintiff that he closed the repair offices and sold off assets, when in reality, no closure occurred, no meaningful assets were sold, and ER continued operating from Plaintiff's leased regional offices using Plaintiff's equipment and staff.

e. Wilson, Gill, and Myers formed and operated Tree City while still employed by Plaintiff and owing fiduciary duties to Plaintiff.

f. Myers removed thousands of trading cards from Plaintiff's stores.

g. Wilson, Gill, and Krebs formed Gametopia and caused Plaintiff to purchase thousands of goods from Gametopia

h. Wilson caused Plaintiff to pay Gametopia for goods while concealing his ownership interest.

i. Parrish and Boswell held managerial roles giving them visibility into inventory flows and operations, and each possessed knowledge of or participation in activities that concealed theft, inventory diversion, or fraudulent purchasing.

67. Defendants intentionally misled Plaintiff regarding purchases, shipments, payroll allocations, and vendor payments, which caused Plaintiff significant material losses.

68. Plaintiff reasonably relied upon Defendants' statements due to the positions of authority they held.

69. As a result of this reliance, Plaintiff suffered substantial financial harm.

70. Wilson, Gill, Myers, Goodson, Clark, Krebs, and Scull intentionally misrepresented the purpose, volume, and legitimacy of repair inventory, trading card shipments, controller purchases, and parts acquisition.

71. Wilson, Gill, Myers, Goodson, Clark, Krebs, and Scull concealed material facts, including their ownership in ER, Tree City, and Gametopia, and their diversion of Plaintiff's inventory to these enterprises.

72. Plaintiff would not have approved inventory shipments, vendor payments, payroll allocations, or purchasing decisions had the truth been known.

73. Wilson's, Gill's, Myers's, Goodson's, Clark's, Krebs's, and Scull's misrepresentations directly caused Plaintiff significant economic losses.

***Count III: Conspiracy***
***(All Defendants)***

74. Except to the extent inconsistent with the relief sought in this Count, Plaintiff incorporates the allegations as set forth above by reference.

75. Defendants knowingly combined and agreed to work together for the unlawful purpose of defrauding Plaintiff.

a. Overt acts taken in furtherance of the conspiracy include:

b. coordinated theft and resale of inventory;

c. setup and operation of competing companies using Plaintiff's assets;

d. routing shipments to unauthorized addresses;

e. falsifying vendor records;

f. laundering kickbacks through shell companies;

g. concealing operations by manipulating email records.

76. As a direct result of Defendants' conspiracy, Plaintiff suffered substantial damages.

***Count IV: Conversion***
***(All Defendants)***

77. Except to the extent inconsistent with the relief sought in this Count, Plaintiff incorporates the allegations as set forth above by reference.

78. Plaintiff owned and had the right to possess hardware, accessories, trading cards, repair tools, leased spaces, and equipment wrongfully taken by Defendant.

79. Defendants intentionally exercised dominion and control over these assets without Plaintiff's authorization.

80. For example, Myers removed tens of thousands of trading card units; Wilson, Gill, and Clark transferred consoles, accessories, repair parts, tools, and fixtures to ER; and Defendants routed shipments to non-store addresses for personal resale.

81. Plaintiff has been deprived of its property and is entitled to compensatory and punitive damages.

***Count V: Embezzlement***
***(Wilson, Gill, Myers, Goodson, Clark)***

82. Except to the extent inconsistent with the relief sought in this Count, Plaintiff incorporates the allegations as set forth above by reference.

83. Defendants misappropriated company funds, inventory, labor, facilities, and intellectual property for their own benefit.

84. Defendants were entrusted with Plaintiff's assets through their employment positions.

85. Defendants diverted funds through unauthorized ACH payments, inflated purchasing schemes, and payroll misuse.

86. Defendants used Plaintiff's leased offices, equipment, and employees to operate competing businesses.

87. Plaintiff suffered quantifiable loss resulting directly from Defendants' intentional misconduct.

***Count VI: Unjust Enrichment***
***(All Defendants)***

88. Except to the extent inconsistent with the relief sought in this Count, Plaintiff incorporates the allegations as set forth above by reference.

89. Defendants knowingly received benefits from Plaintiff, including inventory, labor, equipment, facilities, and financial resources.

90. Defendants retained these benefits without compensation and under circumstances that make retention unjust.

91. Plaintiff is entitled to restitution for the full value of all goods, funds, and services wrongfully taken.

***Count VII: Tortious Interference with Business Relationships***
***(All Defendants)***

92. Except to the extent inconsistent with the relief sought in this Count, Plaintiff incorporates the allegations as set forth above by reference.

93. Defendants intentionally interfered with Plaintiff's business relationships with vendors, suppliers, and customers.

94. Defendants redirected supplier shipments, manipulated vendor accounts, and caused vendors to transact with shell companies rather than Plaintiff.

95. Defendants acted without privilege and with intent to harm Plaintiff.

96. Plaintiff suffered financial loss as a direct result.

***Count VII: Computer Fraud and Abuse Act***
***(Wilson)***

97. Except to the extent inconsistent with the relief sought in this Count, Plaintiff incorporates the allegations as set forth above by reference.

98. Wilson, knowingly and with intent to defraud, exceeded his authorized access to Plaintiff's computer systems by, among other things, using Plaintiff's inventory and ordering system to coordinate theft and resale of inventory, route shipments to unauthorized addresses,

and falsifying vendor records, as well as concealing his activities by manipulating Plaintiff's email records.

99. By means of such conduct Wilson furthered his intended fraud and obtained property of value.

100. As a result of such conduct, Plaintiff suffered damages.

***Count VIII: Defamation (Libel and Libel Per Se)***
***(Myers)***

101. Except to the extent inconsistent with the relief sought in this Count, Plaintiff incorporates the allegations as set forth above by reference.

102. Myers created and disseminated a written document containing false and misleading statements regarding Plaintiff's character, behavior, demeanor, and business practices (the "False Statements").

103. The False Statements are of and concerning Plaintiff as it is reasonably understood to communicate statements and assertion of fact regarding Plaintiff.

104. The False Statements are false and defamatory as they impute on Plaintiff conduct and interactions which did not occur, and therefore, do not represent real events.

105. The defamatory meaning of the False Statements is apparent from the face of the publication without the aid of extrinsic proof, as it is intended to and does indeed disparage and injuriously affect Plaintiff in its sector of business.

106. The False Statements, among other things, falsely accuse, either directly or by innuendo, insinuation, or interference, Plaintiff of criminal, immoral, unprofessional, incompetent, and/or unethical conduct including conduct specific to its sector of business.

107. The False Statements tend to harm Plaintiff's reputation by lowering Plaintiff's otherwise good standing in the mind of a reasonable member of the community.

108. Myers authored and published the False Statements regarding Plaintiff with knowledge either that the assertions contained therein were false or acted with reckless disregard as to truthfulness.

109. The False Statements were intentionally communicated to the public in bad faith and with actual malice.

110. Myers authored and published the False Statements without privilege or authorization, or in excess and abuse of any otherwise applicable privilege or authorization.

111. Plaintiff has suffered reputational harm, loss of revenue, mitigation expenses, and other injuries as a direct and proximate result of the False Statements published by Myers.

112. Plaintiff has incurred damages as a direct and proximate result of the False Statements, and also as a result of the repetition of defamatory statements by third persons, such repetition being the natural consequence of Myers's original publication and/or the express or implied authorization of such repetition.

113. As a direct and proximate result of the False Statements, Plaintiff has suffered significant reputational harm and sustained actual damages including mental anguish, loss of capital revenue, lost productivity, other expenses incurred, and loss of intangible assets, with the exact amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and against all Defendants, jointly and severally, and award the following relief:

A. compensatory damages in an amount not less than the total financial harm suffered by Plaintiff;

B. restitution and disgorgement of all funds, inventory, labor value, and profits wrongfully obtained by Defendants;

C. punitive damages based on Defendants' willful, malicious, fraudulent, and egregious misconduct;

D. Plaintiff's reasonable attorney's fees, expert fees, investigative costs, and litigation expenses;

E. pre-judgment and post-judgment interest; and

F. such further relief as the law allows and the Court deems just.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all claims and issues.

Respectfully submitted,

/s/*Daniel E. Hancock*
Daniel E. Hancock
Molly P. O'Dea
FULTZ MADDOX DICKENS PLC
101 South Fifth Street, 27th Floor
Louisville, Kentucky 40202
P: 502.588.2000
F: 502.588.2020
dhancock@fmdlegal.com
modea@fmdlegal.com

*Counsel for Plaintiff*